# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| **RICKY LEE JAGGERS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **CAUSE NO. 1:14-CV-00010** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Ricky Lee Jaggers appeals to the district court from a final decision of the Commissioner of Social Security denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Jaggers applied for DIB in December 2009, alleging disability as of November 1, 2008. (Tr. 176-82.) He was last insured for DIB on March 31, 2009 (Tr. 122); therefore, he must establish that he was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that he was disabled as of his date last insured in order to recover DIB benefits).

The Commissioner denied Jaggers's application initially and upon reconsideration, and

---

[1] All parties have consented to the Magistrate Judge. (Docket # 19); *see* 28 U.S.C. § 636(c).

Jaggers requested an administrative hearing. (Tr. 122-24, 131-40.) On May 24, 2011, a hearing was conducted by Administrative Law Judge ("ALJ") Terry Miller, at which Jaggers, who was represented by counsel; his wife; and a vocational expert testified. (Tr. 52-121.) On June 20, 2011, the ALJ rendered an unfavorable decision to Jaggers, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of jobs in the economy. (Tr. 36-47.) The Appeals Council denied Jaggers's request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 15-18.)

Jaggers filed a complaint with this Court on January 16, 2014, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Jaggers argues that: (1) the residual functional capacity ("RFC") assigned by the ALJ is flawed because he failed to fairly consider both the findings of Dr. John Taylor, a consulting examiner, and Jaggers's post-colectomy problems with bowel urgency; (2) the ALJ failed to consider and fairly characterize all of the relevant evidence when assessing the credibility of his symptom testimony; and (3) the Appeals Council erred in finding that the additional physical therapy records he submitted were not material. (Social Security Opening Br. of Pl. 6-17.)

## II. FACTUAL BACKGROUND[2]

*A. Background*

On his date last insured, Jaggers was fifty-two years old (Tr. 47, 122); had a ninth grade education and a commercial driver's license (Tr. 10, 204-05); and had past work experience as a flooring installer, delivery van driver, and in produce sales (Tr. 205). Jaggers alleged in his DIB

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 385-page administrative record necessary to the decision.

2

application that arthritis, high blood pressure, and problems with both knees limit his ability to work. (Tr. 203.)

## B. Jaggers's Testimony at the Hearing

At the hearing, Jaggers, who was six feet, two inches tall and weighed 235 pounds at the time, testified that he lives with his wife in their one-story home. (Tr. 58-60.) He is independent with his self care. (Tr. 84.) In a typical day, he performs some household tasks (such as laundry, loading and unloading the dishwasher, and preparing meals), cares for chickens, and watches a little television. (Tr. 82-86, 90-92.) He also supervises his two grandchildren, ages seven and eight, for several hours after school and helps them with their homework. (Tr. 82-84.) He drives a car, occasionally goes grocery shopping, and mows grass with a riding lawnmower in fifteen-minute increments; he attends church every Sunday. (Tr. 60, 85-87, 89-90.) Throughout his daily routine, he frequently takes breaks and lies flat on the floor to reduce his pain. (Tr. 91-92, 94-95.)

In that regard, Jaggers complained of bilateral knee pain, reporting that cortisone shots had been helpful in the past. (Tr. 67-68.) His doctors recommended a knee replacement, but he decided not undergo the surgery. (Tr. 70, 109.) He also complained of constant "sharp pain" on his "left side"–that is, his back, hip, and knee–when walking due to arthritis. (Tr. 71.) He reported intermittent swelling in his right leg, particularly if he sits a lot, since suffering a deep vein thrombosis in 2008. (Tr. 73-74.)

Jaggers takes over-the-counter and herbal medications for his knee and other arthritic pain, and when he had health insurance, he attended physical therapy. (Tr. 71-72, 75-76.) He estimated that, with some pain, he could walk about an eighth of a mile once a day and stand for

3

fifteen to thirty minutes at a time. (Tr. 77-78.) In the last six months, he started using a cane when he first gets up in the morning, although it was not prescribed by a doctor. (Tr. 78-79.) He thought he could sit for thirty minutes at a time (Tr. 79); bending over bothers his back, and he does not climb many stairs (Tr. 80).

Jaggers testified that ever since the removal of a section of his colon three years earlier, he experiences bowel urgency immediately after eating. (Tr. 65-67, 98.) His surgeon told him it was because they had to "cut [him] so low." (Tr. 66; *see also* Tr. 99-100.) Therefore, to avoid soiling himself, Jaggers does not eat when he is away from home. (Tr. 63, 97.) He testified that he was able to return to work as a self-employed delivery driver after his colectomy only because he could "carry a bucket [in his van]" for bowel emergencies to "get by through the day."[3] (Tr. 65.)

### C. Summary of the Medical Evidence

<u>Dr. Thomas Miller, Family Practitioner</u>

Jaggers was seen by Dr. Thomas Miller, a general practitioner, for a variety of complaints from August 2005 to March 2011, including hypertension, abdominal pain and rectal bleeding, diverticulitis, kidney stones, degenerative joint disease, and osteoarthritis. (Tr. 267-86.)

In April 2008, Jaggers presented with a swollen and painful right leg after a prolonged episode of driving. (Tr. 275.) He was diagnosed with a deep venous thrombosis, and Dr. Miller prescribed Coumadin. (Tr. 274, 311-14.) In July 2009, Dr. Miller discontinued the Coumadin, concluding that the blood clot was caused by Jaggers driving for twelve hours straight. (Tr. 269.)

---

[3] Jagger's wife also testified at the hearing, essentially corroborating his testimony. (Tr. 106-10.)

In September 2009, Jaggers reported more problems with his knee and back; Dr. Miller wrote that Jaggers "had it thoroughly worked up about ten years ago and simply does not want to follow [] through on it." (Tr. 267.) In March 2010, Dr. Miller noted that Jaggers was seeking disability based on his hip, back, and knee problems. (Tr. 352.) X-rays revealed mild degenerative changes in the lumbar spine, both knees, and left hip indicative of mild degenerative joint disease; and mild to moderate degenerative changes in the right hip. (Tr. 315-17; 350-51.) In May, Jaggers continued to report back and knee pain that was inhibiting his ability to exercise; Dr. Miller adjusted his medications and recommended he undergo an MRI. (Tr. 349.)

Jaggers attended physical therapy in October 2010. (Tr. 353-56.) He complained of chronic and worsening pain, weakness, poor balance, and poor stability. (Tr. 353.) The evaluation revealed decreased weight bearing on his left leg; a Trendelenburg gait to the left; and decreased strength in his hips, knees, and ankles. (Tr. 353-54.) One week later, however, Jaggers reported less pain in his back.[4] (Tr. 356.)

In March 2011, Jaggers complained of pain in his neck and left elbow radiating to his upper arm, as well as chronic pain in his left hip and leg. (Tr. 348.) Dr. Miller noted tenderness

---

[4] Jaggers submitted twenty pages of additional physical therapy records (dated from March through July 2010 and March through May 2011 (Tr. 359-85)) to the Appeals Council with his request for review of the ALJ's decision. (Tr. 19, 358.) As stated earlier, however, the Appeals Council denied his request for review.
These records, in sum, reflect that at a physical therapy evaluation in March 2010, Jaggers had an antalgic, flexed gait and used a cane. (Tr. 381.) He exhibited some decreased strength in his lower extremities and pain with motion. (Tr. 381.) During the next five months, Jaggers progressed in physical therapy, was compliant with his home exercise program, and reported pain levels from "two" to "seven" on a ten-point scale. (Tr. 373-80.) At another evaluation in March 2011, Jagger again exhibited some pain with motion; an antalgic, flexed gait; and some reduced lower extremity strength. (Tr. 359.) Progress notes during the next few months reflected that Jaggers progressed during therapy, was compliant with his home exercise program, and had fluctuating pain levels. (Tr. 360-69.)

5

to palpation in his left biceps and pain upon range of motion of the elbow. (Tr. 348.) Jaggers refused any anti-inflammatories or pain medication, but requested a referral to physical therapy. (Tr. 348.)

Dr. Todd Brandon, Surgeon

In or near November 2006, Dr. Todd Brandon performed a laparoscopic-assisted sigmoid colectomy for Jaggers's chronic inflammation; the findings reflected high-grade dysplasia. (Tr. 296; *see* Tr. 318-24.) In December 2007, Jaggers underwent a colonoscopy; he had a small polyp and a little inflammation, but biopsies were benign. (Tr. 290.) Dr. Brandon wrote that Jaggers "has been doing very well status post laparoscopic sigmoid colectomy." (Tr. 290.) He told Jaggers to return in a couple of years unless concerns arose in the interim. (Tr. 290.)

Reviewing and Consulting Physicians

In January 2010, Dr. J. Sands, a state agency physician, reviewed Jaggers's record and found there was insufficient evidence to evaluate knee arthritis. (Tr. 287.) The following month, a second state agency psychologist, Dr. B. Whitley, affirmed this opinion. (Tr. 288.)

On April 16, 2011, Dr. John Taylor examined Jaggers and completed a Disability Determination Examination for purposes of his disability application. (Tr. 330-32.) Jaggers reported knee problems; arthritis in both knees, low back, and bilateral hips; and high blood pressure. (Tr. 330.) Dr. Taylor observed that he ambulated normally and was able to get on and off the exam table and in and out of a chair; he could walk on heels and toes and squat halfway to the ground without difficulty. (Tr. 330-31.) His grip strength and range of motion were within normal limits. (Tr. 331.) Although Dr. Taylor noted some paraspinal muscle tenderness, early signs of probable venous insufficiency in the right calf, and difficulty with prolonged sitting, he

6

wrote that there were "[n]o functional limitations noted during this examination." (Tr. 332.)

At that same time, however, Dr. Taylor also completed a Medical Source Statement of Ability to Do Work-Related Activities. (Tr. 335-41.) There he opined that Jaggers could lift and carry up to twenty pounds frequently and twenty to fifty pounds occasionally, but never more than fifty pounds. (Tr. 335.) In an eight-hour workday, he could sit for fifteen to twenty minutes both at a time and in total; stand for one hour both at a time and in total; and walk without a cane for one hour at a time and seven hours in total. (Tr. 336.) He could frequently reach, handle, finger, feel, push, and pull with his upper extremities; frequently operate foot controls; and occasionally climb, stoop, and crawl, but never kneel or crouch. (Tr. 337-38.) He could frequently tolerate exposure to moving mechanical parts, humidity, dust, fumes, vibrations, and extreme cold and heat; frequently operate a motor vehicle; and occasionally work at unprotected heights. (Tr. 339.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On June 20, 2011, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 36-47.) He found at step one that Jaggers had not engaged in substantial gainful activity from his alleged onset date through his date last insured. (Tr. 38.) At step two, the ALJ concluded that Jaggers's history of osteoarthritis of the knees, hip, and back was a severe impairment, but that his history of sigmoid colectomy, deep vein thrombosis, and hypertension were not. (Tr. 38.) At step three, the ALJ determined that Jagger's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 39.)

Before proceeding to step four, the ALJ assigned Jaggers the following RFC as of his date last insured:

> [T]he claimant has the residual functional capacity to perform "light" work . . . (i.e. the ability to perform lifting/carrying/pushing/pulling up to 20 pound[s] occasionally and 10 pounds frequently, with sitting of up to six hours in a eight hour work day and with standing and walking, in combination, for six hours of an eight hour work day). However, he would be further limited as follows: he would need an option to sit/stand, where the individual can change positions every 30

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

minutes, if needed; and, could only occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl.

(Tr. 39-40.) Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Jaggers was unable to perform any of his past work. (Tr. 45.) The ALJ then concluded at step five that as of his date last insured Jaggers could perform a significant number of unskilled, light-exertion jobs in the economy, including inspector, assembler, and machine operator. (Tr. 46.) Accordingly, Jaggers's claim for DIB was denied. (Tr. 46-47.)

### C. The ALJ's Consideration of Dr. Taylor's Opinion Will Be Remanded

Jaggers asserts that the ALJ materially mischaracterized the opinion of Dr. Taylor, who examined him on behalf of the state agency in April 2011, resulting in the ALJ assigning an RFC that was not supported by substantial evidence. For the following reasons, Jaggers's argument is persuasive.

In summarizing Dr. Taylor's opinion, the ALJ stated that it "reflected a retained capacity for light work with essentially an option to sit and stand." (Tr. 44.) The ALJ reiterated this characterization again when assigning Jaggers an RFC, emphasizing that Dr. Taylor's examination findings "support an ability to engage in light work with an option to sit/stand." (Tr. 45.)

Aside from lifting limitations, "a job is in [the light work] category when it requires a good deal of walking *or* standing–the primary difference between sedentary and most light jobs." SSR 83-10, 1983 WL 31251, at *5 (emphasis added). That is, "[t]he full range of light work requires noncontinuous standing or walking for approximately six hours in an eight-hour workday, with intermittent sitting during the remaining two hours." *Id.*; *see also Regadanz v. Astrue*, No. 1:12-cv-14, 2012 WL 7767526, at *5 n.4 (N.D. Ind. Nov. 13, 2012).

10

Here, Dr. Taylor opined on the Medical Source Statement of Ability to Do Work-Related Activities (Physical) that Jaggers could sit for fifteen to twenty minutes at a time and total in an eight-hour period; stand for one hour at a time and *total in an eight-hour period*; and walk for one hour at a time and seven hours total in an eight-hour period. (Tr. 335-36 (emphasis added).) Thus, contrary to the ALJ's characterization, Dr. Taylor's findings, at least those set forth on the Medical Source Statement, do *not* support an ability to engage in light work with a sit-to-stand option. Rather, Dr. Taylor limited Jaggers to standing for just one hour total in an eight-hour period.

The Commissioner advances several arguments why the Court should overlook this inconsistency, finding it harmless. First, the Commissioner points out that Dr. Taylor evaluated Jaggers in April 2011–more than two years after his insured status expired–and as such, the evaluation has little relevance to his abilities during the insured period. Although that argument might have some appeal if the ALJ had discounted Dr. Taylor's opinion on that basis, *see, e.g.*, *Wright v. Astrue*, No. 03-cv-231, 2008 WL 4829950, at *11 (W.D. Wis. Oct. 27, 2008) (affirming the ALJ's rejection of several medical opinions that postdated the plaintiff's date last insured and opined only as to his current condition), here the ALJ did not necessarily do so.

Rather, the ALJ relied on Dr. Taylor's opinion, at least in part, when assigning Jaggers an RFC for light work with a sit-to-stand option.[6] (Tr. 44-45.) As the parties acknowledge, Dr. Taylor was the only medical source of record who opined about Jaggers's work-related limitations, as the state agency physicians simply concluded in January 2010 that there was

---

[6] This raises another problem with the ALJ's consideration of Dr. Taylor's opinion: the ALJ did not explain what weight he assigned to the opinion in accordance with Social Security Ruling 96-6p, 1996 WL 374180, at *2 (stating that although an ALJ is not bound by findings made by state agency or other program physicians, they "must explain the weight given to the opinions in their decisions").

11

"insufficient evidence" to evaluate Jaggers's knee arthritis prior to his date last insured. (Tr. 287-88.)

Of course, work-related limitations articulated in a medical source opinion and the RFC determination "are not the same thing." SSR 96-5p, 1996 WL 374183, at *4. While an ALJ "may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment." *Id*. at *5. The determination of a claimant's RFC is reserved to the Commissioner. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("[A]n ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."); 20 C.F.R. § 404.1546(c); SSR 96-5p, 1996 WL 374183, at *4.

Yet, "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374183, at *7 ("[ALJs] must weigh medical source statements under the rules set out in 20 CFR 20 [§] 404.1527 . . ., providing appropriate explanations for accepting or rejecting such opinions."). Here the ALJ did not explain why Dr. Taylor's one-hour limitation on standing was not adopted. *Compare Burke v. Colvin*, No. 11 C 50001, 2013 WL 5288155, at *14 (N.D. Ill. Sept. 17, 2013) (remanding where the ALJ erred by not explaining why she did not adopt a medical source opinion that conflicted with the RFC), *with Niemiec v. Colvin*, No. 2:12-cv-286, 2013 WL 4782322, at *14 (N.D. Ind. Sept. 5, 2013) (affirming the ALJ's opinion where the ALJ explained the basis for adopting an RFC inconsistent with a medical source opinion).

The Commissioner further asserts that, in any event, Dr. Taylor's findings in the Disability Determination Examination do not align with those in his Medical Source Statement,

and thus, his opinion is not worthy of much weight. These inconsistencies include, most significantly, that Dr. Taylor noted in the Examination that Jaggers thought he could stand up to four hours total in a workday (Tr. 330), but then limited him in the Medical Source Statement to standing just one hour total in a workday (Tr. 336). The Commissioner also urges that Dr. Taylor's Medical Source Statement was likely based more on Jaggers's allegations than the doctor's examination. (Def.'s Mem. in Supp. of the Commissioner's Decision 10.)

But the "problem with this argument is that the ALJ did not make it. '[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine [judicial] review to the reasons supplied by the ALJ.'" *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. Mar. 26, 2005) (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)); *see Kastner v. Astrue*, 697 F.3d 642, 649 (7th Cir. 2012) ("Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." (citations omitted)).

It is the ALJ's responsibility, not the Court's, to confront and resolve any conflicts in the medical evidence. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[The Court may not] reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner."). Rather than acknowledge and resolve the conflict between Dr. Taylor's findings, the ALJ instead ignored, or at least overlooked, the portion of Dr. Taylor's opinion–that Jaggers could stand for only one hour total in a workday–that was inconsistent with the RFC he ultimately assigned.

"The ALJ must evaluate the record fairly." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted). "[A]lthough the ALJ need not discuss every piece of

13

evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Id*. Accordingly, the ALJ's decision will be reversed and remanded for further consideration of Dr. Taylor's opinion in accordance with 20 C.F.R. § 404.1527 and Social Security Rulings 96-6p and 96-8p.[7]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Jaggers and against the Commissioner.

SO ORDERED.

Enter for this 23rd day of September, 2014.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge

---

[7] Because a remand is warranted based on the ALJ's consideration of Dr. Taylor's opinion, the Court need not reach Jaggers's other arguments concerning his bowel urgency, the ALJ's credibility determination, and the additional physical therapy records.